OPINION OF THE COURT
Alexander Chananau, J.
This petition by River Park Towers Tenants Association, Inc., and Fred Brown, as president of this tenants’ association, which seeks a judgment vacating and setting aside the order of the Commissioner of Housing and Community Renewal authorizing an increase in the maximum average room rental for River Park Towers, or alternatively staying the effects of said order and remanding the entire proceeding to the commissioner for further hearings and information-gathering processes to take place, with the direction to review the entire matter de novo, is disposed of as follows:
River Park Associates (the "housing company”) is a limited partnership, one of whose general partners is Harlem River Park Houses, Inc., a united profit housing company under article 2 of the Private Housing Finance Law. River Park Towers is a housing project located at Harlem River, 176th Street, Major Deegan Expressway and 180th Street, in the County of The Bronx, and contains 1,654 apartments comprising 7,386 rental rooms.
The project consists of four buildings and was constructed at an estimated project cost of $76,526,000, financed by a New York State Urban Development Corporation mortgage loan of $72,360,000. River Park Towers was opened for occupancy in September of 1974 with the approval of a rent schedule by the Urban Development Corporation.
On May 6, 1976, the housing company applied to the office of the commissioner for an increase in rentals at River Park Towers, alleging that the rentals together with all other income of "said applicant” were insufficient to enable it to meet payments required by the provisions of the Private
*859 Housing Finance Law. The housing company requested permission to increase rents in the sum of $5.46 (or 9.5%) per room per month effective October 1, 1976, and $5.46 (or 8.7%) per room per month effective October 1, 1977. Notice of said application was given to the tenants and public hearings were held on July 13, August 9, October 20 and November 12, 1976.
Subsequent to the hearings at which both sides were represented by counsel and more than 600 pages of testimony were taken, meetings were held with the commissioner and memoranda were submitted to the commissioner’s office by tenants, management and the commissioner’s own staff. A careful study was made of the transcripts and of the project’s finances and particular problems and suggestions raised by tenants. On May 18, 1977, the first deputy commissioner authorized an increase by the housing company. The commissioner found that the increase was necessary due to increases in the costs of operating this project, that the present maximum average rentals were insufficient to meet the increased cost of maintenance and operating costs, and that such insufficiency could not be corrected by reasonable economies in the management and operation of the project.
Petitioners allege that the evidence before the commissioner, both obtained during the hearings prior thereto and subsequently, requires a determination that the bulk of the increase necessary, if any was necessary, was caused by factors clearly within the control of the housing company and because of improper management. This, petitioners again allege, was compounded by the fact that evidence disclosed that the attorney for the housing company was the managing agent, and was also in part an investor and limited partner in the limited partnership which controls the housing company.
Petitioners next claim that the rent increase application filed by management was stale, and should have been dismissed because evidence disclosed that, with minor exceptions, the housing company was operating on a break-even basis. The tenants suggested that the application was more than one year old at the time the commissioner determined the amount of the increase, and did not reflect current figures.
The petitioners requested the commissioner to dismiss the petition and application because various records sought by the tenants and their representatives were not produced, notwithstanding the requirements of subdivision 5 of section 32-a of the Private Housing Finance Law. The tenants contend that *860 the failure to supply these documents made a farce of the hearing and information-gathering attempts of the commissioner, thus rendering the commissioner’s order arbitrary and capricious by his failure to comply with the State law, which he was appointed to enforce.
The petitioners further claim that the commissioner’s failure to take action on an alleged illegal "double profit” paid by the housing company, amounting to well over $190,000 per year mandates a finding that the commissioner’s order was arbitrary, capricious and without rational basis. Under a managing agent contract, the managing agent is required to perform various duties, including supervision of employees at the premises. At River Park Towers, the managing agent received a 3% annual fee for services. The petitioners allege that management, rather than discharging its duties, subcontracts this work to an outside service and maintenance contractor known as Ferlin Service Industries, Inc.
Based on a review made by the tenants’ certified public accountant of the payroll paid by Ferlin, it was concluded that the direct cost of delivering services for the year amounted to approximately $700,000. However, the housing company paid to Ferlin for those services the sum of $896,000, more than $190,000 in excess of the direct cost. After accounting for gross pay to employees, withholding, benefits, etc., petitioners claim that there was a fringe profit of 23.7% over and above the actual cost to the housing company. For the year 1976, the excess overcost is claimed to be more than $200,000 or 25.96%. Petitioners contend that no matter what figures are accepted, between $100,000 and $200,000 per year is spent to pay Ferlin for a job for which the managing agent is already being paid. The tenants also claim that the delegation of duties by the managing agent amounts to self-supervision by the contractor.
The New York State Legislature has provided sufficient criteria by which the Commissioner of Housing and Community Renewal, entrusted with a certain authority, can carry out the provisions of the Private Housing Finance Law. The intent of article 2 of the Private Housing Finance Law is that these housing projects be maintained through rental income and other incidental income controlled at a rate to make them attractive and available to low and middle income earners. The commissioner has the power to vary rental rents and also *861 the statutory duty to ensure that the housing company has sufficient funds to meet all its necessary expenses.
It is an established principle of law that the Legislature need not prescribe detailed rules for the administrative agency whenever flexibility and adoption of policy to variable conditions constitutes an essential characteristic of the program. Section 31 of the Public Housing Finance Law grants the commissioner the authority and imposes the duty to vary rental rates as is necessary to meet all expenses and maintain the project in secure financial conditions. It appears that the commissioner has properly implemented his authority and fulfilled his duty in compliance with the language and intent of article 2 of the Private Housing Finance Law.
Petitioners’ allegations that the commissioner’s decision to increase rents was arbitrary and capricious is unfounded and unsupported by the record. A determination by an administrative body grounded upon a rational basis, should not be set aside by the courts. The courts will not interfere with an agency decision unless no rational basis for the decision exists or the decision is arbitrary and capricious (Matter of East 12th Assoc. v Leventhal, 38 NY2d 833; Pell v Board of Educ., 34 NY2d 222). The standard is whether a determination could reasonably have been made and not whether the particular determination should be made.
The determination of the acting commissioner was based upon the application for the rent increase, the minutes of a lengthy nonstatutory hearing, reports and memoranda submitted subsequently, as well as conferences with petitioners’ accountant prior to the final determination. The decision was made after a thorough and painstaking review and analysis of the financial condition of the housing company by a staff of auditors and housing management experts whose duty it is to scrutinize and maintain strict supervision over the operation of the housing projects.
Department of Housing and Community Renewal (DHCR) personnel with personal direct knowledge and operating experience with the project played an important and integral part in the aforesaid review. Based upon experience with other housing projects, the commissioner found the requested increases to be in conformity with similar increases in other similar operations. The DHCR estimates showed that a larger increase than was requested by the housing company was necessary for the optimum health of the housing project. In *862 consideration of the hardship faced by the tenants in paying a larger increase, the commissioner refrained from authorizing a larger increase than was considered to be ideally required. A cash short-fall of $1,553,120 is expected by March 31, 1979 even with the inclusion of these contested rent increases.
In order to meet carrying charges and expenses, it was necessary that income and cash flow be increased. The housing company would otherwise be unable to pay its bills and maintain the development in a manner which would be in conformity with apartment house standards. Inflationary trends of the times have increased operational and utility costs which were not precisely and scientifically ascertainable at the time that the project was originally conceived. It was clear that an increase in room rentals was required and absolutely necessary to place the project on a sound financial basis. Failure to do so would necessarily result in insolvency with bankruptcy and foreclosure resulting with attendant impairment of security, great additional expenses and ultimately increased rentals.
 Petitioners’ claim with respect to "staleness” of the housing company’s application is without merit. Furthermore, petitioners’ claims that the fact that the attorney for the housing company is also managing agent and a limited partner in the housing company serves as a basis for denial of the application is unsupported by a further allegation of impropriety or illegality and prejudice.
It appears that substantial delays were caused by the tenants’ representatives who needed time to study the housing company’s operations in depth. The rent increase order was delayed until May 18, 1977, although the application was made in May of 1976. The delay cannot be claimed to have harmed petitioners in that the effective date of the rent increase was considerably later than it would otherwise have been.
Additionally, the housing company application was not by any means the only source of information to the DHCR. The commissioner’s estimates in many cases differed considerably from estimates submitted. These differences evidence the fact that the DHCR updated the information provided by the housing company. This updating was based on all available and current financial information which was carefully analyzed by the DHCR staff.
Petitioners’ contentions with respect to records which *863 were not made available to them at the hearing are without substance. Certain of the requested documents were not in existence, at the time of the hearings. Petitioners’ representatives had full access to all materials, statements and schedules which were available to DHCR staff.
With regard to the report of the investigation of Ferlin Services Industries, the transcript discloses that this report was not in existence at the time of the hearing and that the tenants requested an investigation. DHCR complied with this request by making an exhaustive study of Ferlin’s operations and finances. The absence of certain reports and documents, it appears, would not have affected the commissioner’s determination. The absence of one quarterly report cannot be said to have been essential to a complete evaluation where the petitioners had all prior and subsequent reports.
DHCR found that as to petitioners’ allegations concerning the function performed by Ferlin, the management company and maintenance company have distinct functions. The management company handles rentals, collections and all financial details of the project and oversees the maintenance company’s activities. The maintenance company in addition to normally anticipated functions, provides consulting and research services, bears the costs of labor relations problems and brings a wider experience, expertise and labor pool to the project than otherwise would be available.
DHCR found that the current arrangement with the maintenance company was adequate and efficient. Respondents found no double profit and no proof of any improper relationship was evident from the investigation. The DHCR staff considered the costs for Ferlin’s services to be reasonable. Petitioners contend that certain funds are available from the Federal Government for operating subsidies. In that the United States Department of Housing and Urban Development has declined to fund any such subsidy and the matter is presently being litigated in the Federal courts, no money is currently available.
The court concludes that the commissioner’s function to carry out the public policy of the State and the statutory provisions enacted complementary thereto, to see to it that the State-wide middle income program survives intact, has been properly executed. The commissioner’s determination was made only after public hearings had been completed and the matter completely reviewed. Petitioners have failed to *864 present any evidence by which the commissioner’s decision could be found to be either without rational basis or arbitrary and capricious. Petition is dismissed.